# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv- _____

JASON KIRSCHENBAUM,

      Plaintiff,

v.

STEPHANE DE BAETS, ELEVATED RETURNS, LLC, 315 EAST DEAN ASSOCIATES, INC. and ASPEN DIGITAL, INC.

      Defendants.

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

      Plaintiff Jason Kirschenbaum ("Plaintiff") by his undersigned attorneys, Gulko Schwed, LLP and Richards Carrington, LLC, as and for his Complaint against defendants Stephane De Baets ("De Baets"), Elevated Returns, LLC, 315 East Dean Associates, Inc. and Aspen Digital, Inc. (collectively referred to herein as Defendants) hereby states as follows:

## PRELIMINARY STATEMENT

      1.    This action stems from a myriad of bad acts by Defendants, including *inter alia* breaches of contract, conversion and clear violations of securities law. As described in detail herein, Plaintiff was solicited by Defendants to provide his experience, relationships and money to Defendants in connection with a cryptocurrency venture. Yet, despite Defendants profiting immensely off the back of Plaintiff, Plaintiff has been left with nothing to show for the many years and millions of dollars invested with Defendants.

      2.    Plaintiff invested significant sums of money into the digital token that he and Defendants co-created, yet he is unable to redeem such investment despite his repeated attempts

to do so. Recently, it has also become clear that Defendants have engaged in a scheme to manipulate the market with respect to such tokens and despite assurances by Defendants (and their counsel) that Plaintiff's investment is safe, all such assurances have been futile.

3.      The instant action seeks to recover the significant sums of monies invested by Plaintiff with Defendants and seeks recourse for the current manipulations in the market that affect both Plaintiff's investment and the investing public.

## PARTIES

4.      At all times hereinafter mentioned, plaintiff Jason Kirschenbaum ("Plaintiff") was and is a citizen of the state of New York.

5.      Defendant Stephane De Baets ("De Baets") was and is a citizen of the State of Colorado and the principal and chief executive officer of Elevated Returns, LLC. Defendant De Baets controls and/or maintains interests in other corporate entities, including the other corporate Defendants named herein.

6.      Defendant Elevated Returns, LLC was formed in the State of Delaware, on March 1, 2016 and is a foreign limited liability company licensed to do business in the State of Colorado. Pursuant to the limited liability company agreement ("LLC Agreement") of Elevated Returns, LLC, dated October 6, 2014, defendant De Baets is its sole members and holds 100% of its membership interests.

7.      Defendant 315 East Dean Associates, Inc. is a Delaware Corporation with its principal place of business at 570 Johnson Dr., Aspen, CO 81611.

8.      Defendant Aspen Digital, Inc. is a Maryland Corporation with its principal place of business at 7 St. Paul Street, Baltimore, Maryland 21202.

## <u>JURISDICTION & VENUE</u>

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1367.

10.     The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims "aris[e] under" federal law. 28 U.S.C. § 1331. A "suit arises under the law that creates the cause of action." *American Well Works v. Layne*, 241 US 257 (1916). To determine jurisdiction in federal question cases, the court need only ask "whether—on its face—the complaint is drawn so as to seek recovery under federal law or the Constitution. If so, [the court should] assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1189 (2d Cir.1996). Here, Plaintiff brings claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, which arises under federal law.

11.     Pursuant to 28 U.S.C. 1367, this Court also has jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Where, as here, a party alleges securities violations that are interconnected with other wrongful conduct, supplemental jurisdiction is appropriately exercised. *See In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1254 (D.N.M. 2010) (affirming exercise of supplemental jurisdiction over claims against party accused of breaches of Exchange Act).

12.     In addition, the Court has diversity jurisdiction because the amount in controversy exceeds $75,000.00, and Plaintiff and Defendants are citizens of different states. 28 U.S.C. § 1332(a).

13.     Specifically, Plaintiff is a citizen of New York, Defendant De Baets is a citizen of Colorado, Defendant Elevated Returns is a citizen of Colorado, Defendant 315 East Dean Associates is a citizen of Delaware and Colorado, and Defendant Aspen Digital is a citizen of Maryland. Accordingly, there is complete diversity between Plaintiff and Defendants.

14.     Plaintiff seeks damages far in excess of the jurisdictional threshold of $75,000.

15.     The Court has personal jurisdiction over Defendants because they do business in the District of Colorado and have sufficient minimum contacts with the District. Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, and operations of their platforms at issue in this lawsuit in Colorado, and by retaining the profits and proceeds from these activities, to render the exercise of jurisdiction by this Court permissible under Colorado law.

16.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## FACTUAL & LEGAL BACKGROUND

*Brief Legal / Procedural History*

17.     In June 2019, Plaintiff commenced an action in New York County Supreme Court ("NY Action") against certain defendants for causes of action, including but not limited to unjust enrichment and fraud. Shortly following the commencement of the NY Action, Plaintiff amended his complaint and voluntarily withdrew his claim for breach of contract. After the close of discovery, those defendants moved for summary judgment, which Plaintiff opposed and

simultaneously cross-moved to amend the complaint to include additional claims, including a claim for breach of contract.

18.     While the Court granted those defendants' motion for summary judgment, the Court in its order, dated October 30, 2023, stated: "[F]ollowing the completion of discovery and on the fully developed record, each of these alleged investments is governed by an existing and enforceable contract such that Mr. Kirschenbaum cannot maintain a claim sounding in unjust enrichment."

19.     The Court continued: "[B]ecause Mr. Kirschenbaum's investments in each of the Aspen REIT, Aspen Coin, and Securitize are governed by a valid and enforceable contract, they are precluded from being the predicate of a cause of action for unjust enrichment. . . . Thus, the motion for summary judgment is granted."

20.     Plaintiff brings the instant action for damages in connection with certain securities violations that have recently developed, as well as for his claims for breach of contract that were never adjudicated in the New York Action.

*Organizational Structure*

21.     Elevated Returns is a limited liability company formed and currently operating under the laws of the State of Delaware. Pursuant to the LLC Agreement, defendant De Baets is its sole member and holds 100% of its membership interests. A copy of the LLC Agreement is attached hereto as Exhibit 1.

22.     Mr. Thosapong Jurathavee ("TJ"), a current partner of defendant De Baets and former partner of Plaintiff, acts often and primarily through defendant De Baets, his attorneys, or his daughter Ravipan Jaruthavee.

23.     Defendant De Baets, holds his interests in the REIT (defined herein), its external asset manager/advisor, ER REITS, LLC a/k/a ER-RE, LLC, and its interests in the St. Regis Aspen Hotel, through a spider web of entities and other wholly owned subsidiaries.

*Initial Meetings re: Partnership Structure and Single Asset REIT*

24.     Towards the end of 2015 and beginning of 2016, Plaintiff approached defendant De Baets with the idea, structure, and concept of a single asset real estate investment trust ("REIT").

25.     Plaintiff and defendant De Baets continued to correspond with respect to setting up a REIT and eventually began meeting at the Mercer Hotel in New York City to discuss implementing Plaintiff's ideas.

26.     During the course of these meetings, Plaintiff and defendant De Baets discussed potential ventures and opportunities, including the idea, concept and structure, proposed by Plaintiff, for the creation of a single asset REIT.

27.     In or around February 2016, Plaintiff met again with defendant De Baets and TJ at the Mercer Hotel to discuss further detail of a single asset REIT, as well as to create a company or companies to be used in connection with other ventures.

28.     Plaintiff had prior experience in the REIT space and had significant and diverse relationships that defendant De Baets and TJ wished to monetize.

29.     Between the property holdings of defendant De Baets and TJ, together with Plaintiff's experience and resources in the financial sector and REIT space, a joint venture ensued.

30.     It was understood that defendant De Baets and TJ were to provide the initial assets in forming the REIT, which consisted of certain hotels.

31.     Plaintiff agreed to coordinate and supervise day-to-day tasks pertaining to the asset including business development, working with legal counsel on SEC filings, and advising on the sale and marketing strategy of the asset.

32.     Plaintiff and defendant De Baets continued to discuss joint venture interests, and after some back and forth, on or about February 26, 2016, defendant De Baets offered in writing via e-mail a 25% equity position stating:

> For the ongoing business, I can offer 25% equity . . . my capital partner want 50% so I split my 50% with you. I would say take this as a starting point. we can always renegotiate later.

33.     This resulted in TJ having a 50% equity interest in their joint venture, and defendant De Baets having the remaining 25% equity interest.

34.     Shortly thereafter, Plaintiff and defendant De Baets entered into an oral agreement which also was memorialized in a written agreement, dated March 22, 2016 ("Initial Agreement"). The Initial Agreement is attached hereto as <u>Exhibit 2</u>.

35.     Plaintiff entered into the Initial Agreement, with defendants De Baets and Elevated Returns, which provided that Plaintiff would be entitled to 25% of founder's equity in connection to a certain "Initial Listing." The Initial Listing changed names several times, but continued the same mission and objective. Moreover, at each turn, Plaintiff trusted defendant De Baets; he relied on and his continued (false) assurances, and as a result, expended time, resources and significant money into these ventures.

36.     Specifically, the parties agreed that notwithstanding the sale or outcome of the REIT that was the basis of the Initial Agreement, the Agreement would remain in place and cover future investments.

37.     While Defendants have contended that the Initial Listing failed and thus the Agreement terminated—this is far from true; the Initial Listing succeeded, and as a result, Plaintiff has sought to be compensated for his efforts.[1]

38.     Plaintiff attempted to resolve the instant dispute without the need for judicial intervention, but all such efforts by Plaintiff have been futile. As such, Plaintiff is compelled to bring the instant action to seek monetary and other relief, in connection to claims for *inter alia* breaches of agreement, fraud, and others.

39.     The Initial Agreement, amongst other things, provided a compensation structure relative to the creation of a single asset REIT using the Sunset Tower Hotel in Los Angeles, California and other future deals.

40.     It was expressly understood between the parties hereto that the Initial Agreement was centered around the Sunset Tower deal, as that transaction was live at that time, but the Initial Agreement encompassed the terms for future deals, as well.

41.     In fact, the Initial Agreement expressly provided in at least three (3) different provisions that the terms contemplated therein would apply to "future deals".

---

[1]     The initial intent was to raise $33.5 million in an IPO for a single-asset REIT. *See* St. Regis Aspen plan to go public on stock exchange postponed, The Aspen Times, Feb. 22, 2018, *available online at* https://www.aspentimes.com/news/local/st-regis-aspen-plan-to-go-public-on-stock-exchange-postponed/. As discussed below, Elevated Returns in fact raised $18 million through the launch of Aspen Coin.

42.     Pursuant to the terms of the Initial Agreement, Plaintiff was entitled to twenty-five percent (25%) of the founder's equity issued in connection with the formation of an advisor company.

43.     The Initial Agreement provides that the foregoing arrangement will stay in place with future successful deals. Ex. 2 at 2.

44.     Defendant De Baets confirmed the flexibility and ongoing validity of the Initial Agreement irrespective of the underlying asset repeatedly, including in writing by email dated May 24, 2017.

45.     Defendant De Baets also stated in sworn testimony, "I sold the hotel and in order to bring the experiment to a tangible outcome we decided to replace the underlying asset from the Sunset Tower to the St. Regis Aspen."

46.     Defendant De Baets further testified that the Initial Agreement between the parties was never terminated.

47.     Plaintiff was instrumental and contributed significantly to several projects under the Initial Agreement, including but not limited to the following:

a.      the creation of the Sunset Tower REIT;

b.      the creation of the Aspen REIT and creating Aspen Coin[2];

c.      the acquisition of a certain interest in Securitize;

---

[2]     Notably, Aspen REIT, Inc., as well as Aspen Digital, Inc. were one and the same; they were the simple evolution of Sunset Tower REIT, Inc. Aspen REIT, Inc. and Aspen Digital, Inc. were formerly known as Sunset Tower REIT, Inc. *See* Form A-1 filed with the SEC, attached hereto as Exhibit 10, wherein defendant De Baets changed the name from Sunset Tower REIT, Inc. to Aspen REIT, Inc. to Aspen Digital, Inc.

d.      the development of Elevated Returns/ER Global; and

e.      the capital raise for the acquisition of 21% of Seamico Securities.

48.      As described more fully below, Plaintiff also utilized his relationships to facilitate revenue, opportunities and dealings for defendant De Baets and TJ and their related affiliates.

49.      In addition to the Initial Agreement, the parties entered into additional contracts, including, a certain Purchase Agreement dated October 2, 2018, and a certain Series A Preferred Stock Purchase Agreement dated November 2, 2018.

*Sunset Tower Hotel*

50.      For close to one year, Plaintiff expended significant time and effort on the Sunset Tower deal in connection with the formation and listing on an exchange of a single asset REIT. The initial listing was "expected" to be the Sunset Tower Hotel in Los Angeles, California. *See* Ex. 2 at ¶ 1.

51.      Through a close contact, Plaintiff brought in the law firm of Clifford Chance, LLP to act as counsel in connection with the Sunset Tower REIT and coordinated and assisted in drafting, compiling, and coordinating with legal counsel at Clifford Chance with respect to the S-11.

52.      Plaintiff interfaced with the partners, legal counsel, and other senior executive personnel and was extensively involved in key parts in the preparation of the S-11 including: performing due diligence; writing offering memoranda; creating and evaluating term sheets; evaluating acquisition candidates and deal structures; working with investment bankers and commercial bankers; creating different financial models and scenarios; writing board

presentations; evaluating offers and financing options; and supervising due diligence by prospective investors in the company.

53.     In August 2016, Clifford Chance introduced the parties to an individual named Mike Wirth ("Wirth"), who in short order was hired in a part time position as the chief financial officer.

54.     In order to assemble an attractive compensation package to secure Wirth, at the request of defendant De Baets and with the approval of all the partners, including Plaintiff and TJ, defendant De Baets requested that Plaintiff relinquish 5% of his 25% equity stake so that it could be included in a compensation package to Wirth.

55.     Defendant De Baets also agreed to reduce his own equity interests by 5% so that he would remain at 20% and equal to Plaintiff.

56.     TJ agreed to relinquish or free up 10 percentage points of his equity interests, reducing his interest from 50% to 40%.

57.     On or around October 11, 2016, the law firm of Mayer Brown, LLP circulated an e-mail concerning ER-REITS equity interests providing the following breakdown: Elevated Returns 20%; Jason Kirschenbaum 20%; and Mike Wirth 20%. *See* Emails to and with Jason Kirschenbaum is attached hereto as Exhibit 3 at 1. In addition, on September 25, 2017, defendant De Baets confirmed Plaintiff's interest in an email to Plaintiff. *Id.* at 4. Upon Wirth's departure from Elevated Returns, consistent with the parties' understanding, Plaintiff's equity stake reverted to 25%.

58.     In January 2017, Jeff Klein, owner of Sunset Tower Hotel in West Hollywood, California decided not to go public and list on an exchange. Although the Sunset Deal did not

close as initially planned in March 2017, the Sunset Tower Hotel sold for approximately $100 million (USD).[3]

59.     Defendant De Baets paid Plaintiff $20,000 from the closing of the Sunset Tower Deal and stated to Plaintiff in an e-mail, dated May 24, 2017, that Plaintiff would be paid well on their other future dealings, such as the Aspen REIT.

60.     Defendant De Baets made clear that Plaintiff would be entitled and should expect to receive significantly more money once the REIT was launched. Defendant De Baets described the $20,000 payment as "play money" and that the real money would come in from the St. Regis Aspen Deal. As such, he instructed Plaintiff "[a]ll eyes on Aspen now" and to keep working on the launch of the St. Regis Aspen deal. *See* e-mail attached hereto as <u>Exhibit 4</u> at 1.

61.     Plaintiff relied on defendant De Baet's assurances and clear message that their partnership was very much intact and continued to expend time, efforts and money towards the original objective: the listing of a single asset REIT.

62.     Plaintiff continued to expend his resources on their joint venture and defendant De Baets and TJ knew that he continued to do so, but did not inform Plaintiff that any of the terms of their Initial Agreement had changed or that it was terminated. To the contrary, defendant De Baets deliberately led Plaintiff to believe that their partnership or fee structure as contemplated under the Initial Agreement was fully intact.

---

[3]     In 2015, TJ purchased an 80% stake in the Sunset Tower Hotel for between $60-$75 million (USD). *See* New Power Player Emerges at Sunset Tower Hotel, Page Six, June 28, 2015, *available online at* https://pagesix.com/2015/06/28/new-power-player-emerges-at-sunset-tower-hotel/. TJ's 80% stake was put up for sale in February 2017 with a $100 million (USD) asking price. *See* New York Billionaire Pays $100 Million to Buy Out Sunset Tower Co-Owner, L.A. Business Journal, June 2, 2017, *available online at* https://labusinessjournal.com/real-estate/new-york-billionaire-pays-100-million-buy-out-co-o/.

*St. Regis Aspen REIT (Aspen REIT)*

63.     In or around September 2010, defendant De Baets, via an entity under his direction and control, 315 East Dean Associates acquired the 179 room St. Regis Aspen Hotel ("Aspen Hotel") for $70 million (USD). The Aspen Hotel is currently managed by ER-RE, LLC f/k/a ER REITS, LLC, the asset management arm of Elevated Returns, LLC.

64.     After the Sunset Tower deal changed direction defendant De Baets chose to refocus his efforts and use the Aspen Hotel instead as the underlying real estate for the single asset REIT.

65.     Because the Sunset Tower REIT simply changed names, Defendants had the unique advantage and ability to move quickly in their efforts and launch a single-asset REIT. The whitepaper and the filings with the Security and Exchange Commission (SEC) for Aspen Coin were essentially the same whitepaper and SEC filings in connection to Aspen REIT.

66.     Notably, Aspen REIT, Inc., and Aspen Digital, Inc. were one and the same; they were the simple evolution of Sunset Tower REIT, Inc.

67.     Aspen Digital, Inc., was formerly known as Aspen REIT, Inc. and Sunset Tower REIT, Inc. *See* Form D filed with the SEC, attached hereto as <u>Exhibit 5</u>.

68.     In middle of November 2017, Aspen REIT, a single asset real estate investment trust, filed with the SEC a Regulation A+ initial public offering to raise approximately $33.5 million in gross proceeds.

69.     There was no reason to think that the arrangements and understandings contemplated under the Initial Agreement, that were subsequently reaffirmed between the parties, both orally and in writing, did not continue between the parties.

70.     As far as the parties were concerned, and as evidenced by the filings with the SEC, the Sunset Tower Hotel REIT simply changed its name and morphed into other single-asset REIT without any materials changes in the whitepaper or security submissions.

71.     In January 2018, and after re-filing, the SEC fully approved Aspen REIT as a Single Asset REIT.

72.     The IPO appeared set to proceed by the end of February 2018, but Elevated Returns abruptly canceled the sale on February 26, ostensibly in an effort to retool. It became apparent that defendant De Baets tanked the listing seemingly for the sole purpose of depriving Plaintiff from any remuneration owed to him as a member of Aspen REIT, and in an effort to restructure and evade his obligations to Plaintiff.

73.     Despite the IPO being shelved, the law firm of Clifford Chance continued to work on the St. Regis Aspen REIT and the related St. Regis Aspen Coin projects. Plaintiff also continued to work on the REIT and Aspen Digital and continued to rely on the representations by defendant De Baets.

74.     Throughout this process, defendant De Baets constantly reaffirmed his promises to Plaintiff both verbally and in writing to assure him that their structure was still intact and Plaintiff would remain a partner in their ventures.

75.     For example, in April 2018, defendant De Baets confirmed Plaintiff was a partner in ER Global and writes in an e-mail "**Please add jason as co-founder too.** Lets also pin down a call about who gets what. The sooner the better." *See* e-mail sent by defendant De Baets, dated April 17, 2018, attached hereto as Exhibit 6 at 1 (emphasis added).

76.    During this time Plaintiff divided his time amongst other projects under the Elevated Returns umbrella, including other work and/or projects unrelated to the Initial Agreement,[4] but still continued to work and create whitepaper, private placement memorandum and a deck for Aspen Coin—shares in the St. Regis—that were to be denominated not in bitcoin but in a special securitized token created specifically for the hotel's sale, known as Aspen Coin.

77.    In July of 2018, the private placement memorandum for Aspen Coin was completed, and the parties sought to raise $18 million (USD) for a 19% interest in the Aspen Hotel.

78.    In or around October of 2018, defendant De Baets led Plaintiff to believe that (i) they could not close the Aspen Coin deal if Plaintiff didn't contribute to the deal, and (ii) TJ and East Dean Associates would not contribute to this venture if Plaintiff did not believe in its viability and contribute as well. *See* e-mail from defendant De Baets to Plaintiff, dated September 24, 2018, attached hereto as Exhibit 7.

79.    Plaintiff also understood clearly from defendant De Baets' representations that in the event they were unable to successfully complete the raise, Plaintiff's equity interests and monetary as well as non-monetary investments would be worthless and he would lose his interests in their venture.

80.    As such, Plaintiff relied on the foregoing representations made to him by defendant De Baets, and on or around October 4, 2018, Plaintiff wired a total amount of approximately $1,360,000 in connection with the venture.

---

[4]    Interestingly, Defendants have attempted to use payments that were made for this unrelated work performed by Plaintiff to claim that Plaintiff was duly compensated for his efforts in connection to the Initial Agreement and its subsequent affirmations. This is patently false.

81. In October 2018, Aspen Coin closed at the full $18 million (USD). TJ and East Dean Associates contributed $9 million dollars; defendant De Baets contributed $1.27 million (USD), and Plaintiff contributed over $1.36 million (USD), reaffirming the partnership between defendant De Baets and Plaintiff.

82. Plaintiff was led to believe by defendant De Baets that if he failed to invest the $1.36 million, his venture with Defendants would fail. Defendant De Baets needed to show his Thai partners there was an investor in the United States that was willing to invest in the venture with Defendants. Plaintiff understood that if he did not place this investment, he would lose the time and money he had invested with Defendants.

83. Defendant De Baets shook Plaintiff's hands and re-affirmed their partnership.

84. Plaintiff's efforts and ideas caused defendant De Baets to realize significant profits and caused defendant De Baets to successfully launch Aspen Digital Token, using the St. Regis Aspen Hotel.

85. Based on a recent estimation, ER Global has a current pre-money valuation of $40 million (USD).

86. As such, Plaintiff's 25% share equates to (at the very least) $10 million (USD).

*Securitize, Seamico, and Other Ventures*

87. Plaintiff was instrumental in the capital raises for the acquisition of certain interests in Securitize, Seamico and other ventures, which fall under the Elevated Returns umbrella.

88.     Subsequent to the successful raise for Aspen Coin, the parties were introduced to a company known as Securitize, which provided a compliance platform and protocol for digitizing securities in the blockchain.

89.     In November 2018, Securitize, a company led by Jaimie Finn and Carlos Domingo, entered into a Series A Preferred Stock Purchase Agreement ("Transaction"), whereby in exchange for One Million Dollars ($1,000,000) paid collectively by Plaintiff, and his partners, defendant De Baets, TJ, and defendant Elevated Returns, LLC would receive Series A Preferred Stock at a par value of $.00001 per share interests in Securitize.

90.     On November 8, 2018, defendant De Baets sent Plaintiff a text message informing him that he needed to pay for his investment in Securitize with his digital currency in the form of Aspen Coin.

91.     Plaintiff's investment, the sum of Three Hundred and Thirty-Three Thousand Dollars ($333,000) ("Investment"), was his 1/3 share of the total One Million Dollar ($1,000,000) fee ("Fee") that was earned by Plaintiff and his former partners, defendant De Baets and TJ in connection to the raise done on behalf of Aspen Coin.

92.     Instead of Plaintiff being paid out his share of the Fee, Plaintiff agreed to invest his share of the Fee in the form of digital currency (Aspen Coin), together with his former partners investment in the same form of digital currency, into Securitize.

93.     Plaintiff's investment of significant monies in both Securitize and Aspen Coin guaranteed the success of the Aspen Coin venture. Plaintiff's contributions were material to the creation and success of the St. Regis Aspen REIT and Aspen Coin.

94.     On information and belief, the investment in Securitize was made by Elevated Returns.

95.     However, unbeknownst to Plaintiff, in or around July 2020, Securitize elected to terminate the Transaction and returned the sum of One Million Dollars ($1,000,000) to defendant 315 East Dean Associates. *See* Transfer Request Form, attached hereto as Exhibit 8.

96.     315 East Dean Associates, is an entity believed to be under the direction and control of defendant De Baets and TJ.

97.     The redemption of shares in Securitize and return of funds in connection therewith, included Plaintiff's Investment.

98.     While Plaintiff has made demands for the return of his Investment, to date, he has not received his Investment or any portion thereof.

99.     Moreover, despite counsel for Defendants assurances that Plaintiff "retains his investments" in Securitize, Plaintiff recently discovered that his Investment was in fact not retained by Securitize, as his Investment was redeemed by defendant, and Plaintiff's monies were sent to defendant Stephane De Baets via defendant 315 East Dean Associates. *See* March 26, 2019 Letter, attached hereto as Exhibit 9.

100.    To date, Defendants have failed to make any distributions from the monies invested with Securitize or his other investments with his partners, and has denied Plaintiff the ability to liquidate or redeem his interests in same.

*Recent Developments & Market Manipulations*

101.    Defendants have engaged in a fraudulent scheme to deceive the public into believing that there is an increased demand and consequently less supply of Aspen Coin by creating a "Buy-Back Program."

102.    Under the current buy-back program, some Defendants agreed to buy-back up to $250,000 worth of token in an effort to reduce the supply of Aspen Coin.

103.    In fact, Defendants issued press releases that claim they have bought back over 20,000 tokens at an average price of 3.40 per token.



**ST. REGIS RESORT ASPEN**
Performance Update – Apr. 2024

🔴 NEW TOKEN BUYBACK PROGRAM

Our Sixth buyback program of $250K over 90 days is underway. We have bought back 21,800 tokens at an average price of 3.4usd per token.

104.    Defendants have touted that "token[s] are up around 320%." To date, there have been six (6) buy-back programs. However, Plaintiff has been unable to liquidate his tokens or sell them as part of any buy-back program.

105.    Defendant De Baets has stated that Aspen Coin is the only security token with "any form of volume and demand."[5] The foregoing representation is far from the truth as there is no natural liquidity through buyers and sellers in the marketplace and there is no consistent volume.

106.    Defendants have consistently maintained on their website, blog posts, social media accounts, and elsewhere that Aspen Digital tokens can be sold back to Defendants through their Buy Back program, and that Defendants agreed to buy back up to $250,000 worth of token in an effort to reduce the supply of Aspen Coin and create further false liquidity.

107.    Notwithstanding the foregoing representations, Plaintiff has attempted numerous times to sell his tokens, yet most of such attempts have been futile or below the ostensible market value.

108.    Defendants have engaged in this scheme to avoid making distributions to Plaintiff (and others) for the true value of the tokens and/or in an effort to manipulate the market and inflate volume in an intentional effort to artificially inflate volumes and create a façade that there is liquidity and maintain the values at certain levels.

109.    Plaintiff has made numerous attempts to sell his tokens at an approximate price of $3.40, but only a de minimis portion of Plaintiff's tokens have been purchased.

110.    It is apparent that defendant De Baets, the sole board director and decision-maker for the buy-back program has manipulated the program to create an illusion that there is liquidity, demand, and that the asset is trading above $1, all to benefit himself.

---

[5]    Twitter Post, Oct. 16, 2023, *available online at* https://x.com/StephaneDeBaets/status/.

111.    Most recently, between April 18, 2024 and May 18, 2024, Plaintiff attempted nearly a dozen times to sell his tokens at or around $3.40, but only an insignificant portion of such trades were executed.

112.    In addition, between May 20, 2024 and June 20, 2024, Plaintiff reduced his "sell price" to an amount between $3.35 and $3.34, but despite said reduction, only an insignificant number of tokens were ever sold.

113.    In fact, upon several attempts to sell such tokens, Plaintiff was contacted by T-Zero, a blockchain-based trading platform that defendant De Baets has heavily invested into, which has a checkered past with the Securities and Exchange Commission, with inquiries as to the reason for Plaintiff's trade.

114.    Despite Plaintiff's response that such trades were being done in connection to the buy-back program, all such trades were terminated.

115.    The buy-back program is a farce. Defendants have engaged in this scheme for the sole purpose of controlling the market and in an effort to create an illusion of volume, demand, and liquidity, which does not exist.

116.    Despite the fact that Defendants have marketed the buy-back program as a way to redeem a person's investment in Aspen Coin, the only result has been a false sense of liquidity, increased value of the token, and increased volume on the trading platform.

117.    Defendants have also suspended distributions thereby effectively trapping Plaintiff without any recourse to exit his investment or receive any of the profits that he should otherwise be entitled to.

## COUNT I
### *Declaratory Relief*
### *Against All Defendants*

118.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 117 above as if more fully set forth at length herein.

119.    There is an actual controversy between the parties regarding the nature of the legal relationship between Plaintiff and Defendants

120.    Thus, there is an actual controversy within the jurisdiction of this Court pursuant to 28 U.S.C. §§ 2201 and 2202.

121.    A justiciable controversy exists between Plaintiff and defendant De Baets as to their rights, duties, and responsibilities as related to the existence of a partnership, joint venture, or other equity interest in Elevated Returns, 315 East Dean Associates, and Aspen Digital.

122.    Absent a declaration, Defendants will continue to wrongfully deny the existence of the partnership, joint venture, or other equity interest, and thereby cause Plaintiff harm.

123.    There thus exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of a partnership, joint venture, or other equity interest between Plaintiff and Defendants.

124.    A judicial declaration is necessary and appropriate so that Plaintiff may ascertain his rights regarding his partnership and enforce the same against Defendants.

125.    Plaintiff is entitled to a declaratory judgment that he holds a 25% equity interest in all ventures in connection with the Initial Agreement and the agreements stemming from it.

## COUNT II
### *Breach of Contract*
### *Against all Defendants*

126.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 125 above as if more fully set forth at length herein.

127.    Plaintiff and Defendants entered lawful and enforceable agreements.

128.    Plaintiff has fully performed all of the obligations required to be performed by him.

129.    By reason of the foregoing, Defendants have breached the agreements with Plaintiff, and continue to breach same by inter alia failing to make requisite distributions or provide an accounting.

130.    By reason of the foregoing, Plaintiff is entitled to damages in an amount to be determined but not less than $1.36m.

## COUNT III
### *Conversion*
### *Against Defendants De Baets, Elevated Returns, and 315 East Dean Associates*

131.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 130 above as if more fully set forth at length herein.

132.    A portion of the funds transferred to 315 East Dean Associates, Inc., from Securitize, did not belong to Defendants, but, rather, belonged to Plaintiff.

133.    Defendants committed the wrongful acts described herein without authority to do so.

134.    Defendants committed these acts intentionally and without Plaintiff's knowledge and have interfered with Plaintiff's rights to possess the converted funds.

23

135.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT IV
*Civil Theft*
*Against Defendants De Baets, Elevated Returns, and 315 East Dean Associates*

136.     Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 135 above as if more fully set forth at length herein.

137.     Plaintiff is the rightful owner of a portion of the funds transferred to 315 East Dean Associates, Inc., from Securitize.

138.     Defendants have knowingly, without authorization, obtained and exercised control over the funds belonging to Plaintiff.

139.     Defendants did so with the intent of permanently depriving Plaintiff of his property.

140.     Defendants' theft has damaged Plaintiff in an amount to be proved at trial.

141.     Pursuant to C.R.S. § 18-4-405, Plaintiff is entitled to recover from Defendants three times the amount of his actual damages for theft, as well as the costs and reasonable attorney fees associated with this action.

## COUNT V
*Violation of Section 20(a) of the Exchange Act*
*Against Defendant De Baets*

142.     Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 141 above as if more fully set forth at length herein.

143.    Defendant De Baets participated in the operation and management of Defendants' business, including the oversight of the markets for certain digital tokens, and conducted and participated, directly and indirectly, in the conduct of Defendants' business affairs.

144.    Because of his senior position, defendant De Baets knew the adverse non-public information regarding Defendants' business practices.

145.    As an officer and/or director of a publicly owned company, defendant De Baets had a duty to disseminate accurate and truthful information with respect to Defendants' financial condition and results of operations, and to correct promptly any public statements issued by Defendants which had become materially false or misleading.

146.    Because of his position of control and authority as a senior officer, defendant De Baets was able to, and did, control the contents of the various reports, press releases and public filings which Defendants disseminated in the marketplace.

147.    Defendant De Baets exercised their power and authority to cause Defendants to engage in the wrongful acts complained of herein.

148.    Defendant De Baets therefore, was a "controlling person" of Defendants within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Aspen Digital Token.

149.    Defendant De Baets, therefore, acted as a controlling person of Defendants.

150.    By reason of his senior management positions and/or being a director of Defendants, defendant De Baets had the power to direct the actions of, and exercised the same to cause, Defendants to engage in the unlawful acts and conduct complained of herein.

151.    Defendants exercised control over the general operations of Defendants and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiff.

152.    Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Defendants.

**COUNT VI**
*Violation of Section 9(a) and 9(f) of the Exchange Act*
*Against All Defendants*

153.    Plaintiff repeats and re-alleges each of the allegations contained in paragraphs 1 through 152 above as if more fully set forth at length herein.

154.    Defendants carried out a plan, scheme and course of conduct which was intended to and, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (2) engaged in a scheme to inflate the price of Aspen Digital; and (3) mislead and caused Plaintiff to sell securities at artificially manipulated prices.

155.    In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

156.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of securities in an effort to maintain artificially high market prices for certain digital tokens in violation of Sections 9(a) and 9(f) of the Exchange Act.

157.    All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

158.    By virtue of the foregoing, Defendants made statements which were at the time and in the light of the circumstances under which they were made, false or misleading with respect to the value of securities, which Defendants knew or had reasonable ground to believe were false or misleading.

159.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make said false or misleading statements with respect to the value of securities, which Defendants knew or had reasonable grounds to believe were false or misleading.

160.    Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) defendant De Baets was a high-level executive, director, and/or agent of Defendants during all relevant times and members of Defendants' management team or had control thereof; (2) Defendant De Baets, by virtue of his responsibilities and activities as a senior officer and/or director of Defendants, was privy to and participated in the creation, development and reporting of Defendants' financial condition; (3) Defendant De Baets enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of Defendants' management team, internal reports and other data and information about Defendants' finances, operations, and sales at all relevant times; and (4) Defendant De Baets was aware of Defendants' dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

161.    At the time of said misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed them to be true. Had Plaintiff and the marketplace known the truth regarding the true value of the securities and Defendants' price manipulation, which was not disclosed by Defendants, Plaintiff would not have transacted for Defendants' securities, or, if he had, he would not have done so at the artificially inflated prices.

162.    By virtue of the foregoing, Defendants violated Section 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i (a) and 78i (f).

163.    As a direct and proximate result of Defendants' conduct as described herein, Plaintiff have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

<u>**CONCLUSION**</u>

**WHEREFORE**, Plaintiff, Jason Kirschenbaum, demands declaratory relief, judgment against the Defendants named hereinabove for damages in an amount to be determined at trial of this matter, together with reasonable attorney's fees, the costs and disbursements of this action and such other, further and/or different relief as the Court deems just and proper.

<u>**JURY DEMAND**</u>

Plaintiff demands a jury on all claims so triable.

Dated this 15th day of July, 2024, in Denver, Colorado.

s/*Benjamin W. Hudgens*
Benjamin W. Hudgens
**RICHARDS CARRINGTON, LLC**
1444 Blake Street, Denver, Colorado 80202
Telephone: 303-962-2690
Email:  ben@richardscarrington.com

s/Asher Gulko
Asher Gulko, *admission pending*
**GULKO SCHWED, LLP**
525 Chestnut Street, Suite 207
Cedarhurst, New York 11516
Telephone: 212-500-1312 Main
Email: Asher@gulkoschwed.com

*Attorneys for Plaintiff*