## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01950-CNS

JASON KIRSCHENBAUM,

     Plaintiff,

v.

STEPHANE DE BAETS, ELEVATED RETURNS, LLC, 315 EAST DEAN ASSOCIATES, INC., THOSAPONG JURUTHAVEE, RAVIPAN JURUTHAVEE, ER GLOBAL LLC, ER MERRY WAY LP and ASPEN DIGITAL, INC.

     Defendants.

---

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

---

Plaintiff Jason Kirschenbaum ("Plaintiff" or "Kirschenbaum") by his undersigned attorneys, Gulko Schwed, LLP and Richards Carrington, LLC, as and for his Amended Complaint against defendants Stephane De Baets ("De Baets"), Elevated Returns, LLC, 315 East Dean Associates, Inc. Thosapong Juruthavee ("TJ"), Ravipan Juruthavee ("Ravipan"), ER Global LLC, ER Merry Way LP and Aspen Digital, Inc. (collectively referred to herein as Defendants) hereby states as follows:

### PRELIMINARY STATEMENT

1.     Plaintiff Kirschenbaum was forced to bring this action to recoup the millions of dollars that he invested in hard cash and sweat equity as part of a cryptocurrency venture with Defendants, his former partners—who then betrayed Plaintiff by cutting him out of the deal and denying him his equity in plain breach of the parties' agreement. Making matters worse, Defendants then engaged in a fraudulent buy-back program of that same cryptocurrency in order to cripple Plaintiff's ability to redeem his investment at its true value in a patent violation

1

of the securities laws. Plaintiff has suffered significant harm from Defendants' scheme to fraudulently induce Plaintiff to invest millions of dollars into a cryptocurrency and then hold his investment hostage, refusing his requests for redemption and forcing Plaintiff to sell in the market that Defendants control and manipulate and only at the price that Defendants are willing to pay.

2.    As described in detail herein, starting from the end of 2015 and beginning of 2016, Defendants solicited Kirschenbaum to contribute his experience, relationships and millions of dollars so that the parties could together create an innovative cryptocurrency venture. The parties recognized the market appeal of security tokens, i.e. coins backed by real assets, as the wave of the future and understood that a token backed by a well-known Colorado hotel would merge different investors into one financial product, including both a cryptocurrency investor looking to diversify into more stable and transparent coins, as well as traditional real estate investors who want liquidity and the ability to access trophy assets without having to buy the whole hotel.

3.    As part of their agreement, the parties agreed to divide the equity in their venture as follows: TJ and Ravipan owned 50% of the equity; De Baets owned 25% and Kirschenbaum owned 25%. For years, the parties worked together, and Defendants assured Kirschenbaum that his investment was safe in order to induce him to continue tirelessly devoting all of his efforts to solicit other investors and promote the cryptocurrency the parties had created. But then, in the middle of litigation in New York, counsel for De Baets suddenly took a different position and asserted that Kirschenbaum was *not* entitled to the 25% equity that Defendants had again and again assured him that he owned.

2

4.      Despite Defendants' stringing Kirschenbaum along for years— and profiting immensely off the back of Kirschenbaum— Kirschenbaum has been left with nothing to show for the many years of hard work and millions of dollars he invested with Defendants. Kirschenbaum invested significant efforts and sums of money into the digital token that he and Defendants co-created, and from which Defendants profited tremendously, yet he is unable to redeem such investment despite his repeated attempts to do so.

5.      Defendants' refusal to allow Kirschenbaum to liquidate his investment and redeem his equity portion from his years of hard work is just the tip of the iceberg: Recently, it has also become clear that Defendants have engaged in a scheme to manipulate the market so that Kirschenbaum is now stuck in an investment that he entered into only under false pretenses and is dependent on Defendants' manipulated market price. Defendants created a purported buyback program with respect to that same digital cryptocurrency, but that buy back program is a sham. Instead, Defendants' representations to the market are just false and were intended to (and have) created a false sense of liquidity and volume, and prevented Kirschenbaum from liquidating at its true value the digital token that he had worked with Defendants to create in good faith, before they turned around and stabbed him in the back.

6.      Defendants' wrongful breach of contract and conversion of Kirschenbaum's multi-million dollar investment as well as their manipulation of the Aspen cryptocurrency market in a false buy back program designed to enrich themselves at the expense of Plaintiff is actionable at common law and also violates Colorado statutory law and the Exchange Act. Accordingly, Plaintiff brings the instant action to recover his equity interest pursuant to the parties' agreement, as well as the significant sums of monies invested by Plaintiff with

Defendants, and also seeks recourse for the current manipulations in the market that affect both Plaintiff's investment and the investing public.

## **PARTIES**

7.    At all times hereinafter mentioned, plaintiff Jason Kirschenbaum was and is a citizen of the state of New York.

8.    Defendant Stephane De Baets ("De Baets") was and is a citizen of the State of Colorado and the principal and chief executive officer of Elevated Returns, LLC. Defendant De Baets controls and/or maintains interests in other corporate entities, including the other corporate Defendants named herein. Defendant De Baets, holds his interests in the Aspen REIT, its external asset manager/advisor, ER REITS, LLC a/k/a ER-RE, LLC, and its interests in the St. Regis Aspen Hotel, through a spider web of entities and other wholly owned subsidiaries.

9.    Defendant Elevated Returns, LLC was formed in the State of Delaware, on March 1, 2016 and is a foreign limited liability company licensed to do business in the State of Colorado. Defendant De Baets has made contrary representations as to whether he is the sole member and holds 100% of the equity interest in Elevated Returns, or whether TJ, through Ravipan, owns 60% of the equity interests in Elevated Returns. Elevated Returns is one of the owners directly or indirectly of ER Global.

10.    Defendant 315 East Dean Associates, Inc. is a Delaware Corporation with its principal place of business at 570 Johnson Dr., Aspen, CO 81611.

11.    Defendant Aspen Digital, Inc. is a Maryland Corporation with its principal place of business at 7 St. Paul Street, Baltimore, Maryland 21202.

12.    Defendant Mr. Thosapong Juruthavee ("TJ") is a current partner of defendant De Baets and former partner of Plaintiff. TJ acts often and primarily through defendant De Baets, his

attorneys, or his daughter Ravipan Jaruthavee.

13.    Ms. Ravipan Juruthavee lives at 56 Leonard Street, New York, New York and
owns directly or indirectly 50% of ER Merry Way LP and has committed the wrongful acts
alleged herein on her own behalf and also as an alternate ego of her father, defendant TJ, based
on certain submissions by defendant De Baets, including a letter directed to the SEC, dated
August 11, 2017, which states that "Mr. De Baets and Ms. Jaruthavee own collectively, directly
or indirectly, at least 51% of our common stock."

14.    On information and belief, defendant ER Merry Way LP ("ER Merry") is a
Delaware limited partnership formed on March 13, 2015, and maintains a registered agent at
Nationwide Information Services, Inc., located at 3500 South Dupont Highway, Dover,
Delaware. ER Merry is one of the direct or indirect owners of ER Global.

15.    On information and belief, ER Global, LLC ("ER Global") is a Delaware limited
liability company that was formed on or about July 10, 2018. A copy of the organizational
structure chart of ER Global is attached hereto as Exhibit 1.

## JURISDICTION & VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a)
and 1367.

17.    The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because
Plaintiff's claims "aris[e] under" federal law. 28 U.S.C. § 1331. A "suit arises under the law that
creates the cause of action." *American Well Works v. Layne*, 241 US 257 (1916). To determine
jurisdiction in federal question cases, the court need only ask "whether—on its face—the
complaint is drawn so as to seek recovery under federal law or the Constitution. If so, [the court

5

should] assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits." *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1189 (2d Cir.1996). Here, Plaintiff brings claims under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, which arises under federal law.

18.     Pursuant to 28 U.S.C. 1367, this Court also has jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Where, as here, a party alleges securities violations that are interconnected with other wrongful conduct, including Defendants' scheme to both induce Plaintiff's investment and then wrongfully refuse to redeem that investment except at the price that Defendants have manipulated, supplemental jurisdiction is appropriately exercised. *See In re Thornburg Mortg., Inc. Sec. Litig.*, 683 F. Supp. 2d 1236, 1254 (D.N.M. 2010) (affirming exercise of supplemental jurisdiction over claims against party accused of breaches of Exchange Act).

19.     The Court has personal jurisdiction over Defendants because they do business in the District of Colorado and have sufficient minimum contacts with the District. Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, and operations of their platforms at issue in this lawsuit in Colorado including security tokens that are backed by the St. Regis Hotel located in Colorado, through misrepresentations made in Colorado, through their conversion of Plaintiff's Aspen Coins, and by retaining the profits and proceeds from these activities, to render the exercise of jurisdiction by this Court permissible under Colorado law.

20.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint

arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## **FACTUAL BACKGROUND**

*The Parties Meet and Agree To An Equity Split*

21.     Towards the end of 2015 and beginning of 2016, Plaintiff Kirschenbaum approached defendant De Baets with the idea, structure, and concept of a single asset real estate investment trust ("REIT"). Kirschenbaum and defendant De Baets continued to correspond with respect to setting up a REIT, including by in-person meetings and phone conversations, to discuss implementing Kirschenbaum's ideas. During the course of these meetings, Kirschenbaum and defendant De Baets discussed potential ventures and opportunities, including Kirschenbaum's idea, concept and structure for the creation of a single asset REIT. In or around February 2016, defendant De Baets introduced Kirschenbaum to his partner TJ in New York to discuss further detail of a single asset REIT, as well as to create a company or companies to be used in connection with other ventures.

22.     Kirschenbaum had prior experience in the REIT space and had significant and diverse relationships that defendant De Baets and TJ wished to monetize. Accordingly, the parties agreed to start a business together to share in the profits and liabilities (though the parties did not expect any losses) in which Defendants De Baets and TJ would contribute the property (the asset) and Kirschenbaum would contribute his experience and resources in the financial sector and REIT space.

23.    It was understood that defendant De Baets and TJ were to provide the initial assets in forming the REIT, which consisted of certain hotels, and ultimately, as set forth below, the St. Regis Hotel in Colorado.

24.    Kirschenbaum agreed to coordinate and supervise day-to-day tasks pertaining to the asset including business development, working with legal counsel on SEC filings, and advising on the sale and marketing strategy of the asset, and the parties shared joint management over the venture. In exchange for his contribution, as set forth below, the parties orally agreed that Kirschenbaum would receive 25% of founder's equity in the venture.

*The Parties Agree That Plaintiff Owns 25% of the Equity*

25.    Plaintiff Kirschenbaum's 25% equity interest was memorialized in several writings. After some back and forth, on or about February 26, 2016, defendant De Baets offered in writing via e-mail a 25% equity position stating:

> For the ongoing business, I can offer 25% equity . . . my capital partner want 50% so I split my 50% with you. I would say take this as a starting point. we can always renegotiate later.

26.    Kirschenbaum accepted De Baets' offer and the parties agreed that the equity in the new venture would be divided as follows: TJ (and his daughter Ravipan) owned 50% of the equity; De Baets owned 25% and Kirschenbaum owned 25%.

27.    The parties also signed a letter agreement dated March 22, 2016 which is attached hereto as Exhibit 2. That agreement reflected the parties' oral agreement and stated that Kirschenbaum "would be **entitled to Twenty Five Percent (25%) of the founders equity."** The March 2016 agreement was centered around and "expected" that the single asset for the REIT would be the Sunset Tower Hotel in Los Angeles, California (the "Initial Listing"), that listing changed names several times, but continued the same mission and objective. Moreover, at each

8

turn, Kirschenbaum trusted defendant De Baets; he relied on and his continued (false) assurances, and as a result, expended time, resources and significant money into these ventures.

28.    The terms of the March 2016 agreement provided that it applied not only to the parties' initial project, but future deals as well.  While the March 2016 agreement referenced the Sunset Tower Hotel as that transaction was live at that time (and provided a compensation structure relative to the creation of a single asset REIT), the parties agreed that their equity arrangement encompassed the terms for future deals, as well. Specifically, the parties agreed that notwithstanding the sale or outcome of the REIT that was mentioned in the agreement with an asset of the Sunset Tower Hotel, the agreement would remain in place and cover future investments. In fact, the Initial Agreement expressly provided in at least three (3) different provisions that the terms contemplated therein would apply to "future deals".

*29.*    Defendants were entitled to terminate the agreement if the company was not successful, but Defendants never did so.

*The Parties Swap Out The Sunset Hotel For The Aspen Hotel*

30.    The Sunset Tower REIT (what ultimately turned into the Aspen REIT) required significant work from Kirschenbaum. Through a close contact, Kirschenbaum brought in the law firm of Clifford Chance, LLP to act as counsel in connection with the Sunset Tower REIT and coordinated and assisted in drafting, compiling, and coordinating with legal counsel at Clifford Chance with respect to the S-11. Kirschenbaum interfaced with the partners, legal counsel, and other senior executive personnel and was extensively involved in key parts in the preparation of the S-11 including: performing due diligence; writing offering memoranda; creating and evaluating term sheets; evaluating acquisition candidates and deal structures; working with investment bankers and commercial bankers; creating different financial models and scenarios;

9

writing board presentations; evaluating offers and financing options; and supervising due diligence by prospective investors in the company.

31.    In August 2016, Clifford Chance introduced the parties to an individual named Mike Wirth ("Wirth"), who in short order was hired in a part time position as the chief financial officer. In order to assemble an attractive compensation package to secure Wirth, at the request of defendant De Baets and with the approval of all the partners, including Kirschenbaum, TJ and Ravipan, defendant De Baets requested that Plaintiff relinquish 5% of his 25% equity stake so that it could be included in a compensation package to Wirth. Defendant De Baets also agreed to reduce his own equity interests by 5% so that he would remain at 20% and equal to Plaintiff. TJ and Ravipan agreed to relinquish or free up 10% of their equity interests, reducing their interest from 50% to 40%.

32.    On or around October 11, 2016, the law firm of Mayer Brown, LLP circulated an e-mail concerning ER-REITS equity interests providing the following breakdown: Elevated Returns 20%; Jason Kirschenbaum 20%; and Mike Wirth 20%. *See* Emails to and with Jason Kirschenbaum, attached hereto as Exhibit 3 at 1. In addition, on September 25, 2017, defendant De Baets confirmed Plaintiff's interest in an email to Plaintiff. *Id.* at 4. Upon Wirth's departure from Elevated Returns, the parties agreed that Plaintiff's equity stake reverted to 25%.

33.    In 2017, the parties decided to swap out the Sunset Tower for the St. Regis Aspen but the deal remained the same. Aspen REIT, Inc., as well as Aspen Digital, Inc. were one and the same; they were the simple evolution of Sunset Tower REIT, Inc.: Aspen REIT, Inc. and Aspen Digital, Inc. were formerly known as Sunset Tower REIT, Inc. *See* Form 1-A filed with the SEC, attached hereto as Exhibit 4, wherein defendant De Baets changed the name from

Sunset Tower REIT, Inc. to Aspen REIT, Inc. to Aspen Digital, Inc; *see also* Form D filed with

the SEC, attached hereto as <u>Exhibit 5</u>. As Defendant De Baets stated in sworn testimony, "I sold

the hotel and in order to bring the experiment to a tangible outcome we decided to replace the

underlying asset from the Sunset Tower to the St. Regis Aspen."

34.     The reason for the swap was that in January 2017, Jeff Klein, owner of Sunset

Tower Hotel in West Hollywood, California decided not to go public and list on an exchange.

Although the Sunset Deal did not close as initially planned in March 2017, the Sunset Tower

Hotel sold for approximately $100 million (USD).[1] Defendant De Baets paid Kirschenbaum

$20,000 from the closing of the Sunset Tower Deal and stated to Kirschenbaum in an e-mail,

dated May 24, 2017, that he would be paid well on their other future dealings, such as the Aspen

REIT. Defendant De Baets described the $20,000 payment as "play money" and that the real

money would come in from the St. Regis Aspen Deal. As such, he instructed Kirschenbaum

"[a]ll eyes on Aspen now" and to keep working on the launch of the St. Regis Aspen deal. *See* e-

mail attached hereto as <u>Exhibit 6</u> at 1. In oral conversations between the parties, Defendant De

Baets made clear that Kirschenbaum would be entitled to his 25% equity interest and should

expect to receive significantly more money once the Aspen REIT was launched.

35.     In reliance on these assurances and conversations that the parties' agreement

continued, Kirschenbaum continued to expend time, efforts and money towards the original

objective: the listing of a single asset REIT. Defendants De Baets and TJ knew and directed

---

[1] In 2015, TJ and Ravipan purchased an 80% stake in the Sunset Tower Hotel for between $60-$75 million (USD). *See* New Power Player Emerges at Sunset Tower Hotel, Page Six, June 28, 2015, *available online at* <u>https://pagesix.com/2015/06/28/new-power-player-emerges-at-sunset-tower-</u> <u>hotel</u>/. TJ's 80% stake was put up for sale in February 2017 with a $100 million (USD) asking price. *See* New York Billionaire Pays $100 Million to Buy Out Sunset Tower Co-Owner, L.A. Business Journal, June 2, 2017, *available online at* <u>https://labusinessjournal.com/real-</u> <u>estate/new-</u> <u>york-billionaire-pays-100-million-buy-out-co-o/</u>.

Kirschenbaum to continue to expend significant efforts on the development of the Aspen REIT

for the parties, and never said in any way, shape or form that any of the terms of the parties'

agreement had changed or was terminated. To the contrary, defendant De Baets deliberately told

Kirschenbaum that their partnership, fee structure, and equity split as agreed upon was fully

intact.

36.    Once Jeff Klein decided not to take the Sunset Hotel public, the parties decided

to swap that property for the 179 room St. Regis Aspen Hotel ("Aspen Hotel") that defendant

De Baets had acquired in September 2010, via an entity under his direction and control, 315

East Dean Associates for $70 million. After the Sunset Tower deal changed direction defendant

De Baets chose to refocus his efforts and use the Aspen Hotel instead as the underlying real

estate for the single asset REIT. The Aspen Hotel is currently managed by ER-RE, LLC f/k/a

ER REITS, LLC, the asset management arm of Elevated Returns, LLC.

37.    Because the Sunset Tower REIT simply changed names, the parties had the

unique advantage and ability to move quickly in their efforts and launch a single-asset REIT.

The whitepaper and the filings with the Security and Exchange Commission (SEC) for Aspen

Coin were essentially the same whitepaper and SEC filings in connection to Aspen REIT. In

middle of November 2017, Aspen REIT, a single asset real estate investment trust, filed with the

SEC a Regulation A+ initial public offering to raise approximately $33.5 million in gross

proceeds.

38.    As far as the parties were concerned, and as evidenced by the filings with the

SEC, the Sunset Tower Hotel REIT simply changed its name and morphed into other single-

asset REIT without any materials changes in the whitepaper or security submissions. None of

the parties *ever* expressed that the arrangements and understandings contemplated under the parties' agreement, that were subsequently reaffirmed between the parties, both orally and in writing, somehow changed in the swap – and on the contrary, Defendants represented that Kirschenbaum's 25% equity interest continued in the Aspen REIT. In January 2018, and after re-filing, the SEC fully approved Aspen REIT as a Single Asset REIT.

*Kirschenbaum Contributes $1.36 Million To Aspen Coin*

39.    The IPO for the St. Regis Aspen was set to proceed by the end of February 2018. But Elevated Returns abruptly canceled the sale on February 26, ostensibly in an effort to retool. Based on the massive inflow of venture capital funding feal estate tokenization platforms, Defendants determined that the costs of an IPO were not justified when it was in reality a private placement to some professional investors. (Discovery in the New York litigation subsequently revealed that defendant De Baets tanked the listing seemingly for the sole purpose of depriving Kirschenbaum from any remuneration owed to him as a member of Aspen REIT, and in an effort to restructure and evade his obligations to Kirschenbaum).

40.    Instead, Defendants restructured the sale of shares in the St. Regis as a special securitized token created specifically for the hotel's sale, known as Aspen Coin.  Despite the IPO being shelved, the law firm of Clifford Chance continued to work on the St. Regis Aspen REIT and the related St. Regis Aspen Coin projects. Kirschenbaum also continued to work on the REIT and Aspen Digital and continued to rely on the representations by defendant De Baets. Throughout this process, defendant De Baets constantly reaffirmed his promises to Kirschenbaum both verbally and in writing to assure him that their structure was still intact and

Kirschenbaum would remain a partner in their ventures. For example, in April 2018, defendant

De Baets confirmed Plaintiff was a partner in ER Global and writes in an e-mail "**Please add**

**jason as co-founder too.** Lets also pin down a call about who gets what. The sooner the better."

*See* e-mail sent by defendant De Baets, dated April 17, 2018, attached hereto as <u>Exhibit 7</u> at 1

(emphasis added). On a flight to Colorado in August 2018, Defendants De Baets and TJ

discussed with Kirschenbaum their agreement to share the equity in ER Global and

Kirschenbaum's investment in Aspen Coin (as well as the Seamico deal, discussed further

below), and based on this agreement, the parties jointly marketed Aspen Coin to potential

investors in the cryptocurrency space.

      41.     Consistent with the parties' agreement, Kirschenbaum continued to work and

create whitepaper, private placement memorandum and a deck for Aspen Coin along with other

projects with Elevated Returns.[2]  In July of 2018, the private placement memorandum for

Aspen Coin was completed, and the parties sought to raise $18 million (USD) for a 19% interest

in the Aspen Hotel.

      42.     Besides for his significant work on Aspen Coin, Kirschenbaum was fraudulently

induced to invest millions of dollars in Aspen Coin. In or around October of 2018, defendant De

Baets made misrepresentations to Kirschenbaum that: (i) they could not close the Aspen Coin

deal if Kirschenbaum didn't contribute to the deal, and (ii) TJ, Ravipan and 315 East Dean

Associates would not contribute to this venture if Kirschenbaum did not believe in its viability

and contribute as well. Defendant De Baets needed to show his Thai partners there was an

---

[2] Defendants have attempted to use payments that were made for this unrelated work performed by Plaintiff to claim
that Plaintiff was duly compensated for his efforts in connection with the March 2016 agreement and its subsequent
affirmations. This is patently false.

investor in the United States that was willing to invest in the venture with Defendants. *See* e-mail from defendant De Baets to Plaintiff, dated September 24, 2018, attached hereto as Exhibit 8. Kirschenbaum reasonably relied on those statements because De Baets had access to information that Kirschenbaum did not, and was the one in communication with TJ. Those statements were false. De Baets also represented to Kirschenbaum that in the event they were unable to successfully complete the raise, Kirschenbaum's equity interests and monetary as well as non-monetary investments would be worthless and he would lose his interests in their venture. Kirschenbaum was led to believe by defendant De Baets that if he failed to invest the $1.36 million, his venture with Defendants would fail and that if he did not place this investment, he would lose the time and money he had invested with Defendants.

43.     In reliance on the foregoing representations made to him by defendant De Baets, on or around October 4, 2018, Plaintiff wired a total amount of approximately $1,360,000 in connection with the venture. Based on Defendants' false representations, the parties entered into a Purchase Agreement dated October 2, 2018 pursuant to which Mr. Kirschenbaum agreed to purchase $1,360,000 worth of Aspen Digital Inc. Kirschenbaum's $1.36 million investment was specifically identifiable because it was converted into specifically identifiable digital coins. The parties understood and agreed that Defendants would liquidate or redeem Kirschenbaum's coins under commercially reasonable terms. Defendants have not done so.

_____

*The Parties' Venture Is Successful*

44.     In October 2018, Aspen Coin closed at the full $18 million (USD). TJ, Ravipan and 315 East Dean Associates contributed $9 million dollars; defendant De Baets contributed

$1.27 million (USD), and Plaintiff contributed $1.36 million (USD) in reliance on Defendants' false statements. Defendant De Baets shook Kirschenbaum's hand and re-affirmed their partnership.

45.    Kirschenbaum's efforts and ideas caused defendant De Baets to realize significant profits and caused defendant De Baets to successfully launch Aspen Digital Token, using the St. Regis Aspen Hotel.

46.    Kirschenbaum was instrumental and contributed significantly to several projects under the parties' agreement, including but not limited to the creation of the Sunset Tower/Aspen REIT; Aspen Digital Inc. a digital token for St. Regis Aspen; the acquisition of a certain interest in Securitize, as set forth below; and the development of Elevated Returns/ER Global.

47.    Kirschenbaum was instrumental in the capital raises for the acquisition of certain interests in Securitize, Seamico and other ventures, which fall under the Elevated Returns umbrella. Through Kirschenbaum, Elevated Returns acquired 21% of Seamico Securities (BKK: ZMICO) later renamed XSpring Capital in 2021. Seamico Securities is a Bangkok-based company which acts as a securities brokerage and provides trading of derivatives and securities, an investment advisory service, online securities trading, securities underwriting, and borrowing and lending of securities. The deal was crucial for Elevated Returns because it gave it access to regulatory licenses and distribution capability in Thailand and other parts of Southeast Asia, a region that has been at the forefront of regulations for digital assets. Additionally, because Seamico Securities is an early adopter of digital currencies and has a strong track record to match its reputation within Southeast Asia, Seamico Securities was the ideal broker for Elevated

Returns to work with to achieve its vision of the new-world investment methods supporting the access of investors to the established asset classes.

48.    In 2019, Kirschenbaum introduced Defendants to Slava Rubin who then made the introduction to Tezos Foundation Hubertus. From Kirschenbaum's connections, Elevated Returns was able to raise $5 million from Tezos Foundation Hubertus and $10 million in equity raised from investors. In 2019, Elevated Returns invested $15 million in Seamico. The proceeds of Elevated Returns' investment was expected to go toward creating technology that facilitates crypto security token exchanges, general working capital, and seeding crypto-centric investment funds.

49.    Defendants' investment with Seamico was wildly successful. In June 2021, Elevated Returns' portfolio company XSpring Capital formerly known as Seamico Securities, secured fundraising of $225 million USD through a partnership with Sansiri, Viryah Insurance, and local private investor Mongkol Prakitchaiwattana and stated that it would use the funds to build its fully integrated financial marketplace which combines traditional and digital investment products at a single destination. Terms of the 2021 agreement include a $136 million USD private placement to Sansiri, Viryah, and Prakitchaiwattana as well as a rights offering of $86 million USD to all existing XSpring shareholders.

50.    Kirschenbaum also utilized his relationships to facilitate revenue, opportunities and dealings for defendant De Baets and TJ and their related affiliates.

51.    Based on a recent estimation, ER Global has a current pre-money valuation of $40 million (USD). As such, Kirschenbaum's 25% share equates to (at the very least) $10

million (USD).

_Defendants Invest Plaintiff's Fee_

52.     The parties also earned a $1 million fee in connection with the capital raise done

on behalf of Aspen Coin. Under the terms of the parties' agreement, Kirschenbaum was entitled

to 1/3 share of that fee ($333,000).

53.     Rather than pay Kirschenbaum the fee to which he was entitled, Defendants told

Kirschenbaum that he needed to use his digital currency in Aspen Coin to pay for his investment

in a company known as Securitize, which provided a compliance platform and protocol for

digitizing securities in the blockchain.

54.     In November 2018, Securitize, a company led by Jaimie Finn and Carlos

Domingo, entered into a Series A Preferred Stock Purchase Agreement, whereby in exchange for

One Million Dollars ($1,000,000) paid collectively by Kirschenbaum, and his partners,

defendant De Baets, TJ and Ravipan, defendant Elevated Returns, LLC would receive Series A

Preferred Stock at a par value of $.00001 per share interests in Securitize. On November 8, 2018,

defendant De Baets sent Kirschenbaum a text message informing him that he needed to pay for

his investment in Securitize with his digital currency in the form of Aspen Coin.

55.     Kirschenbaum's investment, the sum of Three Hundred and Thirty-Three

Thousand Dollars ($333,000) was his 1/3 share of the total One Million Dollar ($1,000,000) fee

that was earned by Kirschenbaum and his former partners, defendant De Baets and TJ and

Ravipan in connection to the raise done on behalf of Aspen Coin. Instead of Kirschenbaum being

paid out his share of the $1 million fee, Plaintiff (after De Baets' text message) ultimately agreed

18

to invest his share in the form of digital currency (Aspen Coin), together with his former partners

investment in the same form of digital currency, into Securitize. On information and belief, the

investment in Securitize was made by Elevated Returns and Kirschenbaum had a possessory

interest in 1/3 of that investment. The parties understood and agreed that Defendants would

liquidate or redeem Kirschenbaum's investment when Elevated Returns liquidated its

investment.

56.    Kirschenbaum's investment of significant monies in both Securitize and Aspen

Coin guaranteed the success of the Aspen Coin venture. Kirschenbaum's contributions were

material to the creation and success of the Securitize investment, the St. Regis Aspen REIT and

Aspen Coin.

57.    However, unbeknownst to Kirschenbaum, in or around July 2020, Securitize

elected to terminate the Transaction and returned the sum of One Million Dollars ($1,000,000) to

defendant 315 East Dean Associates. *See* Transfer Request Form, attached hereto as Exhibit 9.

The redemption of shares in Securitize and return of funds in connection therewith, included

Kirschenbaum's $333,000 investment.

58.    While Kirschenbaum has made demands for the return of his investment, to date,

he has not received his $333,000 investment or any portion thereof.

*Defendants Assure Plaintiff That He Owns Equity*

59.    Throughout the years that the parties worked together, Defendants repeatedly

acknowledged the parties' agreement that Kirschenbaum had an ongoing equity interest in the

venture. Defendant De Baets confirmed the flexibility and ongoing validity of the March 2016

19

agreement irrespective of the underlying asset repeatedly, including in writing by email dated

May 24, 2017. There are also numerous text messages between the parties that refer to

Kirschenbaum's equity— and not a *single* time where Defendant De Baets said that

Kirschenbaum did not own equity.

60.    Likewise, on March 1, 2019, Defendant De Baets emailed Kirschenbaum

(copying TJ) "Your equity in Aspen Digital is very intact as you and your token are sitting in

securitize platform."

61.    Defendants' lawyers also continued to string Kirschenbaum along by telling him

that his $1.36 million investment was secure and invested in Aspen Coin and Securitize. On

March 19, 2019, Defendants' counsel Richard Menaker wrote to Kirschenbaum's counsel:

> "Kirschenbaum also invested personal in various properties the company established or
> invested in, including a venture called Aspen Coin and another called Securitize,
> Kirschenbaum retains his investments in those enterprises."

62.    But despite counsel for Defendants' assurances that Kirschenbaum "retains his

investments" in Securitize, Kirschenbaum recently discovered in the New York action (as

described below) that his investment was in fact not retained by Securitize, and that instead, his

investment was redeemed by defendants, and Kirschenbaum's monies were sent to defendant

Stephane De Baets via defendant 315 East Dean Associates. *See* March 26, 2019 Letter, attached

hereto as Exhibit 10. To date, Defendants have failed to make any distributions from the monies

invested with Securitize or his other investments with his partners, and has denied Kirschenbaum

the ability to liquidate or redeem his interests in same.

*The New York Action and the Breach of the Parties' Agreement*

63.     In June 2019, Plaintiff commenced an action in New York County Supreme Court ("NY Action") against the defendants here (minus Ravipan who was never previously a defendant) for breach of contract, breach of fiduciary duty, and other claims. *Kirschenbaum v. De Baets*, INDEX NO. 653287/2019 (Sup. Ct. N.Y. Cty.), Dkt. 1. Shortly following the commencement of the NY Action, Plaintiff amended his complaint to allege claims for fraud, conversion, a declaratory judgment and other claims, and voluntarily withdrew his claim for breach of contract. *Id.*, Dkt. 30. In October 2020, the New York court dismissed all of Plaintiff's claims without prejudice, with the exception of his claim for unjust enrichment, denied Plaintiff leave to amend, and also found that it did not have personal jurisdiction over TJ and that Plaintiff had not properly requested leave to add Ravipan in his proposed complaint. Dkt. 18-1, Ex. C; *Kirschenbaum v. De Baets*, 2020 NY Slip Op 33406(U), ¶ 14 (Sup. Ct. N.Y. Cty. 2020).

64.     It was only during the New York action that Defendants for the first time denied Kirschenbaum his equity share that he was entitled to under the parties' agreement. Defendants contended for the first time that Kirschenbaum was an employee rather than a partner, that the equity split detailed in several documents including the March 2016 letter agreement was limited to the Sunset Hotel REIT, and Kirschenbaum had no continuing equity interest in the parties' venture, thereby repudiating the parties' agreement. Indeed, the very same Defendants' counsel who had reassured Kirschenbaum that his $1.36 million investment in Aspen Coin and $333,000 in Securitize was intact, then did an about face and submitted to the Court that "no cash whatsoever was ever invested by Defendants in Securitize; nor was there any 'fee' from the Aspen Digital transaction" —the exact opposite of what he had previously told Kirschenbaum's attorneys. See Dkt. 222.

21

65.    Plaintiff also only discovered Defendants' misrepresentations during discovery in the New York action—but not through documents produced by Defendants. While Defendants for the first time took the position that Kirschenbaum has no interests in the Securitize transaction, and that it was a Swap Deal with no money transferred between the parties, Defendants refused to produce any evidence of the investment and threatened to *sue* Securitize if any information was released to Kirschenbaum. Nevertheless, Securitize provided the Redemption Certificate, issued by Securitize on July 2, 2020 and paid to the order of 315 East Dean, an entity under the control of Defendant DeBaets which for the first time alerted Kirschenbaum that Defendants had cashed out of Securitize, including Kirschenbaum's security interest—all without telling Plaintiff.

66.    At the close of discovery, the New York trial court granted Defendants' motion for summary judgment on Plaintiff's sole remaining claim for unjust enrichment. *Kirschenbaum v. De Baets*, 2023 NY Slip Op 33880[U], *1 (Sup. Ct. N.Y. Cty. 2023). The court found that "each of these alleged investments is governed by an existing and enforceable contract such that Mr. Kirschenbaum cannot maintain a claim sounding in unjust enrichment."

*Market Manipulation*

67.    In the middle of the New York litigation, and using the confidential information that they obtained from discovery in the New York litigation, Defendants engaged in a fraudulent scheme to deceive the public into believing that there is an increased demand and consequently less supply of Aspen Coin by creating a "Buy-Back Program" that is false. Defendants' representations to the market were intended to (and have) created a false sense of liquidity and volume, and prevented Kirschenbaum from liquidating at its true value the digital

token that he had worked with Defendants to create in good faith.

68.    Under the purported buy-back program, some Defendants agreed to buy-back up
to $250,000 worth of token in an effort to reduce the supply of Aspen Coin. Defendants issued
press releases that claim they have bought back over 20,000 tokens at an average price of 3.40
per token.



**ST. REGIS RESORT ASPEN**
Performance Update – Apr. 2024

🔴 NEW TOKEN BUYBACK PROGRAM

Our Sixth buyback program of $250K over 90 days is underway. We have bought
back 21,800 tokens at an average price of 3.4usd per token.

Defendants have touted that "token[s] are up around 320%." To date, there have been six (6)
buy-back programs. However, Kirschenbaum has been unable to liquidate the full share of his
tokens or sell them as part of any buy-back program.

69.    Defendant De Baets has stated that Aspen Coin is the only security token with
"any form of volume and demand."[5] The foregoing representation is likewise not true as there is
no natural liquidity through buyers and sellers in the marketplace and there is no consistent
volume.

70.    Defendants have consistently maintained on their website, blog posts, social

23

media accounts, and elsewhere that Aspen Digital tokens can be sold back to Defendants through their Buy Back program, and that Defendants agreed to buy back up to $250,000 worth of token in an effort to reduce the supply of Aspen Coin and create further false liquidity. Notwithstanding the foregoing representations, Plaintiff has attempted numerous times to sell his tokens, yet most of such attempts have been futile or below the ostensible market value.

71.     The timing of the pretend buy-back program was no accident: Defendants engaged in this scheme to avoid making distributions to Kirschenbaum (and others) for the true value of the tokens. In a transparent retaliation for the litigation that Kirschenbaum had filed in New York, Defendants' fake buy back program was designed to, and did, manipulate the market and inflate volume in an intentional effort to artificially inflate volumes and create a façade that there is liquidity and maintain the values at certain levels.

72.     Kirschenbaum has made numerous attempts to sell his tokens at an approximate price of $3.40, but only a de minimis portion of Plaintiff's tokens have been purchased.

73.     It is apparent that defendant De Baets, the sole board director and decision-maker for the buy-back program has manipulated the program to create an illusion that there is liquidity, demand, and that the asset is trading above $1, all to benefit himself.

74.     Most recently, between April 18, 2024 and May 18, 2024, Kirschenbaum attempted nearly a dozen times to sell his tokens at or around $3.40, but only an insignificant portion of such trades were executed. In addition, between May 20, 2024 and June 20, 2024, Plaintiff reduced his "sell price" to an amount between $3.35 and $3.34, but despite said reduction, only an insignificant number of tokens were ever sold.

75.     In fact, upon several attempts to sell such tokens, Kirschenbaum was contacted by T- Zero, a blockchain-based trading platform that defendant De Baets has heavily invested into, which has a checkered past with the Securities and Exchange Commission, with inquiries as to the reason for Plaintiff's trade. Despite Plaintiff's response that such trades were being done in connection to the buy-back program, all such trades were terminated.

76.     The buy-back program is a farce. Defendants have engaged in this scheme for the sole purpose of controlling the market and in an effort to create an illusion of volume, demand, and liquidity, which does not exist. Despite the fact that Defendants have marketed the buy-back program as a way to redeem a person's investment in Aspen Coin, the only result has been a false sense of liquidity, increased value of the token, and increased volume on the trading platform.

77.     Defendants have also suspended distributions thereby effectively trapping Plaintiff without any recourse to exit his investment or receive any of the profits that he should otherwise be entitled to.

78.     Through this fake buy-back program, Defendants have achieved what they set out to do to Kirschenbaum all along as part of their illicit scheme: trap Kirschenbaum into an investment that he could not get out of, first by promising him equity and then telling him that if he wants to keep the value of that equity, that he needs to contribute more cash, then telling him that the proceeds that he was entitled to were being reinvested, and now that he wants out, that he can only liquidate on Defendants' manipulated prices and on the time table that Defendants unilaterally set. Even though Kirschenbaum has asked for his Aspen Coins back multiple times, Defendants' hidden intentions were to keep him stuck in Aspen Coin so that he

25

would be forced to sell in the amount and time that Defendants want so that Defendants can pay back Kirschenbaum using the cash flow from the hotel rather than pay him back for his investment. Defendants have thereby created the false impression to the market of liquidity, but screwed over Kirschenbaum and other market participants who purchased Aspen Coins assuming a market free of fraud.

## COUNT I
### *Declaratory Relief*
### *Against All Defendants*

79.     Plaintiff repeats and re-alleges each of the allegations contained above as if more fully set forth at length herein.

80.     There is an actual controversy between the parties regarding the nature of the legal relationship between Plaintiff and Defendants and Plaintiff's entitlement to certain investments that were made on his behalf by Defendants.

81.     Thus, there is an actual controversy within the jurisdiction of this Court pursuant to 28 U.S.C. §§ 2201 and 2202.

82.     There is an actual, bona fide, and justiciable controversy between Plaintiff and defendant De Baets as to their rights, duties, and responsibilities as related to the existence of a partnership, joint venture, or other equity interest in Elevated Returns, 315 East Dean Associates, and Aspen Digital, and to Plaintiff's share of the $1 million fee in connection with the capital raise done on behalf of Aspen Coin that Defendants subsequently invested in Securitize on behalf of Plaintiff, and as to Plaintiff's rights in connection with his $1.36 million investment that he made in Aspen Coin. The declaration sought herein deals with a

present controversy as to an ascertainable set of facts.

83.     Absent a declaration, Defendants will continue to wrongfully deny the existence
of the partnership, joint venture, or other equity interest in ER Global, Aspen Digital and
Securitize (or any proceeds therefrom), and thereby cause Plaintiff harm.

84.     There thus exists a controversy of sufficient immediacy and reality to warrant
the issuance of a declaratory judgment of a partnership, joint venture, or other equity interest
between Plaintiff and Defendants and that Plaintiff has an interest in the investment that
Defendants made on his behalf.

85.     A judicial declaration is necessary and appropriate so that Plaintiff may assert
his interest in the investment that Defendants made on his behalf and/or ascertain his rights
regarding his partnership, joint venture or other equity interest and enforce the same against
Defendants, including his rights in management and managing his investment and the
proceeds therefrom.

86.     Plaintiff has no adequate remedy at law.

87.     By reason of the foregoing, Plaintiff is entitled to a declaratory judgment that
he holds a 25% equity interest in ER Global, that he is entitled to 1/3 of the $1 million fee that
the parties earned in connection with the capital raise done on behalf of Aspen Coin that
Defendants reinvested Plaintiff's $333,000 fee share with Securitize and that Plaintiff is
entitled to manage that investment and any returns from that investment in proportion to his
equity share.

## COUNT II
*Breach of Contract*
*Against all Defendants*

88.     Plaintiff repeats and re-alleges each of the allegations above as if more fully set forth at length herein.

89.     Plaintiff and Defendants entered lawful and enforceable agreements. Under those agreements, Plaintiff is entitled to 25% equity interest in ER Global, and 1/3 of the $1 million fee that the parties earned in connection with the capital raise done on behalf of Aspen Coin ($333,000).

90.     In addition, the parties understood and agreed that Defendants would liquidate or redeem Kirschenbaum's $1.36 million in Aspen coins under commercially reasonable terms.

91.     The parties also agreed that Kirschenbaum would be paid a management fee for his work and as 25% equity owner of ER-Reits. The Private Placement Memorandum for ER-RE makes this clear, and states "We will pay our Manager a base management fee, in cash, payable quarterly in arrears, in an amount equal to 1.5% of our stockholders' equity." That agreement further provided "Our Manager will also be eligible to receive an incentive fee in an amount equal to the excess of (i) the product of (a) 20.0% and (b) the excess of (1) our Core Earnings for the previous 12-month period, over (2) the product of (A) our stockholders' equity in the previous 12-month period and (B) 7.0% per annum, over (ii) the sum of any incentive fees paid to our Manager with respect to the first three calendar quarters of such previous 12-month period."

92.     Plaintiff has fully performed all of the obligations required to be performed by

him.

93.     By reason of the foregoing, Defendants have breached the agreements with

Plaintiff, and continue to breach same by inter alia failing to make requisite distributions or

provide an accounting or to pay him his management fees. Defendants also repudiated their

agreements with Plaintiff by staking out claims in litigation in New York that Plaintiff was not

entitled to his equity interest.

94.     By reason of the foregoing, Plaintiff is entitled to damages in an amount to be

determined but not less than $10m.

### COUNT III
*Conversion*
*Against Defendants De Baets, Elevated Returns, and 315 East Dean Associates*

95.     Plaintiff repeats and re-alleges each of the allegations above as if more fully set

forth at length herein.

96.     As alleged above, Kirschenbaum's $1.36 million investment was specifically

identifiable because it was converted into specifically identifiable digital coins. The parties

understood and agreed that Defendants would liquidate or redeem Kirschenbaum's coins

under commercially reasonable terms. But Defendants did not do so, and instead converted

Kirschenbaum's $1.36 million investment for their own personal benefit.

97.     Moreover, as alleged above, under the terms of the parties' agreement,

Kirschenbaum was entitled to 1/3 of the $1 million fee that the parties had earned in

connection with the capital raise done on behalf of Aspen Coin. Rather than pay

Kirschenbaum the fee to which he was entitled, Defendants told Plaintiff that he needed to use his digital currency in Aspen Coin to pay for his investment in Securitize. The parties understood and agreed that Defendants would return Plaintiff's investment, and all proceeds therefrom, when it liquidated its investment in Securitize.

98.     A portion of the funds transferred to 315 East Dean Associates, Inc., from Securitize, did not belong to Defendants, but, rather, belonged to Plaintiff. Plaintiff's investment was specifically identifiable because it was paid for using specifically identifiable digital tokens.

99.     Defendants committed the wrongful acts described herein without authority to do so. Defendants committed these acts intentionally and without Plaintiff's knowledge and have interfered with Plaintiff's rights to possess the converted funds.

100.     By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT IV
*Fraudulent Inducement*
*Against Defendants De Baets, and Elevated Returns*

101.     Plaintiff repeats and re-alleges each of the allegations above as if more fully set forth at length herein.

102.     As set forth in detail above, De Baets made material misrepresentations or omissions concerning existing facts in order to induce Plaintiff to invest $1.36 million in Aspen Coin.

103.     Defendants' representations were materially false and misleading,

including that: (i) they could not close the Aspen Coin deal if Kirschenbaum didn't contribute to the deal, (ii) TJ, Ravipan and 315 East Dean Associates would not contribute to this venture if Kirschenbaum did not believe in its viability and contribute as well; and (iii) De Baets was going to monetize his investment if Kirschenbaum did not contribute and in the event they were unable to successfully complete the raise, Kirschenbaum's equity interests and monetary as well as non-monetary investments would be worthless and he would lose his interests in their venture.

104.    Defendants knew or should have known these representations were false and misleading. Defendants reasonably knew and intended that Plaintiff would rely on Defendants' false and misleading representations and Plaintiff reasonably relied on Defendants' misrepresentations.

105.    By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT V
### *Civil Theft*
*Against Defendants De Baets, Elevated Returns, and 315 East Dean Associates*

106.    Plaintiff repeats and re-alleges each of the allegations above as if more fully set forth at length herein.

107.    Plaintiff is the rightful owner of a portion of the funds transferred to 315 East Dean Associates, Inc., from Securitize.

108.    Defendants have knowingly, without authorization, obtained and exercised control over the funds belonging to Plaintiff.

109.    Defendants did so with the intent of permanently depriving Plaintiff of his property.

110.    Defendants' theft has damaged Plaintiff in an amount to be proved at trial.

111.    Pursuant to C.R.S. § 18-4-405, Plaintiff is entitled to recover from Defendants three times the amount of his actual damages for theft, as well as the costs and reasonable attorney fees associated with this action.

**<u>COUNT VI</u>**
*Violation of Section 20(a) of the Exchange Act*
*Against Defendant De Baets*

112.    Plaintiff repeats and re-alleges each of the allegations above as if more fully set forth at length herein.

113.    Defendant De Baets participated in the operation and management of Defendants' business, including the oversight of the markets for certain digital tokens, and conducted and participated, directly and indirectly, in the conduct of Defendants' business affairs.

114.    Because of his senior position, defendant De Baets knew the adverse non-public information regarding Defendants' business practices.

115.    As an officer and/or director of a publicly owned company, defendant De Baets had a duty to disseminate accurate and truthful information with respect to Defendants' financial condition and results of operations, and to correct promptly any public statements issued by Defendants which had become materially false or misleading.

116.    Because of his position of control and authority as a senior officer, defendant De Baets was able to, and did, control the contents of the various reports, press releases and public filings which Defendants disseminated in the marketplace.

117.    Defendant De Baets exercised his power and authority to cause Defendants to engage in the wrongful acts complained of herein.

118.    Defendant De Baets therefore, was a "controlling person" of Defendants within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Aspen Digital Token. Defendant De Baets, therefore, acted as a controlling person of Defendants.

119.    By reason of his senior management positions and/or being a director of Defendants, defendant De Baets had the power to direct the actions of, and exercised the same to cause, Defendants to engage in the unlawful acts and conduct complained of herein.

120.    Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) defendant De Baets was a high-level executive, director, and/or agent of Defendants during all relevant times and members of Defendants' management team or had control thereof; (2) Defendant De Baets, by virtue of his responsibilities and activities as a senior officer and/or director of Defendants, was privy to and participated in the creation, development and reporting of Defendants' financial condition; (3) Defendant De Baets enjoyed significant personal contact and

familiarity with the other Defendants and was advised of and had access to other members of Defendants' management team, internal reports and other data and information about Defendants' finances, operations, and sales at all relevant times; and (4) Defendant De Baets was aware of Defendants' dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

121.    Defendants exercised control over the general operations of Defendants and possessed the power to control the specific activities, which comprise the primary violations about which Plaintiff.

122.    Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Defendants.

<u>**COUNT VII**</u>
*Violation of Section 9(a) and 9(f) of the Exchange Act*
*Against All Defendants*

123.    Plaintiff repeats and re-alleges each of the allegations above as if more fully set forth at length herein.

124.    Defendants have engaged in a fraudulent scheme to deceive the public into believing that there is an increased demand (and consequently less supply) of Aspen Coin by creating a "Buy-Back Program" that is false. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of

34

business that operated as a fraud and deceit upon the purchasers of securities in an effort to maintain artificially high market prices for certain digital tokens in violation of Sections 9(a) and 9(f) of the Exchange Act.

125.    Defendants created and represented to the public that there was a buyback program for Aspen Coins — when there was not — in order to fraudulently create the appearance of liquidity and induce the purchase, sale or retention of Aspen Coins by Plaintiff and the investment public. Defendants carried out a plan, scheme and course of conduct which was intended to and, did: (1) deceive the investing public, including Plaintiff, as alleged herein; (2) engaged in a scheme to create the appearance of liquidity in Aspen Coin or artificially inflate the price of Aspen Digital; and (3) mislead and caused Plaintiff to hold or sell his securities at artificially manipulated prices.

126.    Defendants consciously injected false and misleading information into the marketplace that interfered with the natural forces of supply and demand. Defendants did so in order to fraudulently benefit themselves at the expense of Plaintiff and the investing public. By creating the false sense of liquidity, Defendants artificially inflated the value of Aspen Coin and thereby benefitted from price fixing the value of their own investment at the $3.40 price that they unilaterally set, when that was not the true value of Aspen Coin.

127.    All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

128.    By virtue of the foregoing, Defendants made statements which were at the

time and in the light of the circumstances under which they were made, false or

misleading with respect to the value of securities, which Defendants knew or had

reasonable ground to believe were false or misleading.Defendants, individually and in

concert, directly and indirectly, by the use, means or instrumentalities of interstate

commerce and/or of the mails, engaged and participated in a continuous course of

conduct to make said false or misleading statements with respect to the value of

securities, which Defendants knew or had reasonable grounds to believe were false or

misleading.

129.    Plaintiff relied on an assumption that the market for Aspen Coin was

efficient and free of manipulation when he invested in Aspen Coin and purchased his

digital currency, when he held or retained his investment, and when he attempted to sell

his shares, and sold a de minimus amount of shares at a price below Defendants'

advertised buy back program. Had Plaintiff and the marketplace known the truth

regarding Defendants' control over the market and manipulation of the price of

redemption, which was not disclosed by Defendants, Plaintiff would not have transacted

for or held Defendants' securities, or, if he had, he would not have done so at the

artificially inflated prices.

130.    Defendants' misrepresentations about a false "Buy Back" program has

affected the price by which Plaintiff can sell its Aspen Coins. At the time of said

misrepresentations and omissions, Plaintiff was ignorant of their falsity, and believed

them to be true. Plaintiff has not been able to redeem his securities at their true value

because of this artificially high price, and has not been able to find buyers for his coins

because of Defendants' market manipulation.

131.    Plaintiff has been significantly harmed by this fake buy back program where the only result has been a false sense of liquidity, increased value of the token, and increased volume on the trading platform. By creating the illusion that there is liquidity, demand, and that the asset is trading above $1, Defendants have manipulated the market to avoid paying Plaintiff (and others) the true value of the tokens and artificially inflate volumes, and prevented Plaintiff from cashing out his investment at its true value. Defendants have also suspended distributions thereby effectively trapping Plaintiff without any recourse to exit his investment or receive any of the profits that he should otherwise be entitled to.

132.    By virtue of the foregoing, Defendants violated Section 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i (a) and 78i (f).

133.    As a direct and proximate result of Defendants' conduct as described herein, Plaintiff have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

## CONCLUSION

**WHEREFORE**, Plaintiff, Jason Kirschenbaum, demands declaratory relief, judgment against the Defendants named hereinabove for damages in an amount to be determined at trial of this matter, together with reasonable attorney's fees, the costs and disbursements of this action and such other, further and/or different relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury on all claims so triable.

Dated this 9th day of December, 2024, in Denver, Colorado.

*s/Asher Gulko*
Asher Gulko
Samuel Kadosh *(admission pending)*
**GULKO SCHWED, LLP**
525 Chestnut Street, Suite 209
Cedarhurst, New York 11516
Telephone: 212-500-1312 Main
Email: Asher@gulkoschwed.com
Skadosh@gulkoschwed.com

*Attorneys for Plaintiff*